BRUNETTE and wife, Respondents, V. SLEZEWSKI, Appellant.

*February 27—April 11, 1967.*

For the appellant there was a brief by *Lontkowski & Lontkowski* of Green Bay, and oral argument by *Edward C. Lontkowski.*

For the respondents there was a brief by *Evrard, Evrard, Duffy, Holman & Faulds* of Green Bay, and oral argument by *John P. Duffy.*

WILKIE, J. The sole question presented on this appeal is whether there is credible evidence to sustain the jury's finding of damages to the plaintiffs in the amount of $4,000.

The trial court instructed that damage due to loss of mink be computed at market value of those mink which "would be demonstrated by the reasonable cost of replacing mink with comparable animals." Thus, the "replacement cost" was the measure of damages used by the jury. In our opinion, the record supports the jury finding.

*First.* The plaintiffs produced a Mr. Haesseler who testified that the cost of replacing a mink such as those destroyed is between $10 to $20, and averages $15. He further testified that he would consider mink bought for less than that price to be worthless. True, the defendant produced evidence that the replacement cost would be $7 to $9. But the jury award could have been made on the basis of Mr. Haesseler's testimony.

*Second.* The real problem in computing damages in this case was that the plaintiffs were unable to testify as to the exact number and type of mink kits lost. The reason for this was that female mink often eat their kits, and

plaintiffs collected the remainder of the dead kits in cans without counting them. Also young mink kits are not counted. Plaintiffs had four different types of mink (sapphires, aleutians, whites, and pastels) whose pelts varied in price. This made an exact ascertainment of damages impossible, and defendant argues that, therefore, there is no credible evidence to support the jury verdict.

Norbert Brunette testified that 103 of his female mink produced a litter. After the plane flew over, 73 of these females no longer had kits. In addition, plaintiff testified that about 50 mink kits were destroyed in the remaining females' litters. Mr. Brunette and several other witnesses testified that the average litter was a little over four in number. The jury could determine that the number of mink kits lost was thus 340–350 as a minimum.

Thus, the jury award is supported by credible evidence.

Some question is raised about the proper measure of damages on the death of mink; that is, whether damages should be founded on the market value of mink at pelting age or whether such damages should be computed from replacement cost at the time of the wrong.

*Smith v. Atco Co.*[1] holds that the market value should be based upon the value at pelting age. In *Smith* the mink were being grown as pelters, not as breeders. So, too, in *Bell v. Gray-Robinson Construction Co.,*[2] the earlier case applying the same measure.

In instances where the mink are being raised as pelters, the market value of the mink at pelting age is the correct test and this would have been the preferable test in the instant case. However, even under this test there is sufficient evidence in the record to support the jury award.

Testimony as to value was difficult because the value of the pelts varies according to the sex of the mink and the species of the mink, and no breakdown of the kits lost

[1] (1959), 6 Wis. (2d) 371, 393, 94 N. W. (2d) 697.

[2] (1954), 265 Wis. 652, 62 N. W. (2d) 390.

was made according to these factors. However, several witnesses testified that the average price of a mink pelt, considering these factors, was $15 or more. In addition, the bulk of the testimony established that the cost of raising mink kits to maturity and the cost of drying the pelts totaled between $2 and $3. Thus the evidence establishes a net recovery of about $12 per mink and multiplying this figure by the minimum loss of mink kits (340–350), on the market value test the evidence sustains the jury award of $4,000.

Where the mink are breeders, as in *Nelson v. Boulay Brothers Co.*,[3] the situation is different. The value of a breeder is more stable. The market value of breeders may vary according to the season,[4] but they do not ordinarily have the marked increase in market value that a pelter shows during pelting season. The damage resulting from the loss of a breeder is fairly measured by its market value at the time of loss, which can be demonstrated by the reasonable cost of replacing the mink with a comparable animal.

*By the Court.*—Judgment affirmed.

HANSEN, J., took no part.

---

[3] (1965), 27 Wis. (2d) 637, 135 N. W. (2d) 254.
[4] *Nelson v. Boulay Brothers Co., supra,* footnote 3, at page 644.